UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.                                                  **Hon. Hugh B. Scott**

                                                    08CR349S

                                                    **Report &
                                                    Recommendation**

Simon Banda Mireles, aka Jorge Alberto DeLarco Gonzales,
Sergio Antonio Resendiz Martinez, Javier Banda Mireles,
Alberto Antimo Mireles, Miguel Angel Antimo Mireles, Honorio
Banda Mireles, Jesus Francisco Escalante, Maurilio Bautista
Feria, Alejandro Garcia, Alvaro Soto Paz, and Agustin Quinones
Torres,

                        Defendants.


        Before the Court are various motions filed on behalf of the respective defendants,

including the following:

                Alberto Antimo Mireles (Docket Nos. 13, 14, 33 and 62) seeking
                to join in motions filed on behalf of defendant Sergio Antonio
                Resendiz; dismissal of Count 2 of the Indictment; severance of
                trial; suppression of a statement given on April 16, 2008; and
                suppression of evidence. Alberto Antimo Mireles's guilty plea was
                accepted by the Court on October 28, 2009. (Docket No. 123).
                Except as otherwise noted below, these motions are moot.

                Miguel Angel Antimo Mireles (Docket No. 15) seeking
                suppression of statements taken on February 26, 2007 and March
                1, 2007; (Docket Nos. 22 and 35) joining in motions of other
                defendants. Miguel Angel Antimo Mireles's guilty plea was
                accepted by the Court on October 28, 2009. (Docket No. 78).

1

Unless otherwise noted below, these motions are moot.

Joint Motion by Sergio Antonio Resendiz, Javier Banda Mireles, Alvaro Soto Paz, Jeses Francisco Escalante, Miguel Angel Antimo Mireles, Simon Banda Mireles, Alberto Antimo Mireles, and Honorio Banda Mireles (Docket No. 17) seeking a bill of particulars; Rule 16 discovery; exculpatory information and joinder of motions made by other defendants.

Honorio Banda Mireles (Docket No. 19) seeking dismissal of the Indictment as insufficient; Rule 16 disclosure; information pursuant to Rules 404, 607, 608 and 609 of the Federal Rules of Evidence; statements of witnesses and grand jury testimony; exculpatory information; severance of trial; bill of particulars; suppression of evidence and statements.[1]

Alejandro Gracia (Docket No. 31) joining in motions of other defendants. Alejandro Gracia's guilty plea was accepted by the Court on October 28, 2009. (Docket No. 94). Unless otherwise noted below, these motions are moot.

Jesus Francisco Escalante (Docket No. 61) seeking dismissal of the Indictment due to the deportation of material witnesses; suppression of evidence obtained from 774 Central Avenue in Dunkirk, New York; disclosure of statements of witnesses.

Sergio Antonio Resendiz (Docket No. 64) seeking suppression of evidence obtained as a result of the search of 101 Lincoln Avenue, Salamanca, New York; the El Caporal Restaurant in Cheektowaga, New York; the Don Lorenzo Restaurant in Allegany, New York; the La Herradura Restaurant in Bradford, Pennsylvania; and as the result of a traffic stop and arrest on December 11, 2007.

---

[1] The motion to suppress by Honorio Banda Mireles was prophylactic in nature. The defendant's papers noted that the government had not disclosed any statements or confessions attributable to Honorio Banda Mireles, but that should the government do so, he wished to suppress any statements allegedly made by the defendant in violation of this constitutional rights. (Docket No. 19-4). Honorio Banda Mireles has not identified any statements attributed to him; nor has he made any further motions in this regard. Thus, this motion is moot.

## Background

On December 4, 2008, the Grand Jury for the Western District of New York indicted defendants  Simon Banda Mireles, aka Jorge Alberto DeLarco Gonzales, Sergio Antonio Resendiz Martinez, Javier Banda Mireles on charges of obtaining the labor and services of persons by threats of serious harm, physical restraint, by means of a scheme to cause those persons to believe that if they did not perform such labor and services that they would suffer serious harm and physical restraint and by means of the abuse and threatened abuse of the law and the legal process in violation of 18 U.S.C. §§ 1589 and 1594(a) [Count One].  Count Two of the Indictment charges that those three defendants, along with Alberto Antimo Mireles, Miguel Angel Antimo Mireles, Honorio Banda Mireles, Jesus Francisco Escalante, Maurilio Bautista Feria, Alejandro Garcia, Alvaro Soto Paz, and Agustin Quinones Torres knowingly and in reckless disregard that certain aliens entered and remained in the United States illegally, concealed, harbored, and shielded those illegal aliens from detection for commercial gain in violation of  8 U.S.C. §§ 1324(a)(1)(A)(iii) and 1324(a)(1)(B)(i).

Several defendants have entered guilty pleas in this case.  Those remaining are:  Simon Banda Mireles (aka Jorge Alberto DeLarco Gonzales), Sergio Antonio Resendiz Martinez, Javier Banda Mireles, Honorio Banda Mireles, Jesus Francisco Escalante.

**Motion to Dismiss Count 2**

Sureness of the Indictment: The defendants[2] argue that Count 2 of the indictment should be dismissed because the Count fails to specify what commercial advantage was gained by the defendant. (Docket No. 14-2 at page 2). Count Two of the Indictment charges the defendants with violations of §§1324(a)(1)(A)(iii) and 1324(a)(1)(B)(i) of Title 8 of the United States Code. A charge under §1324(a)(1)(A(iii) does not require that the defendant obtain a commercial advantage. Section 1324(a)(1)(B)(i) sets forth sentencing parameters with respect to violations of §1324(a) when the offense was done "for the purpose of commercial advantage or private financial gain."

Rule 7(c) of the Federal Rules of Criminal Procedure requires that an indictment contain a "plain, concise and definite written statement of the essential facts constituting the offense charged." Fed.R.Civ.P. 7(c). "This requirement is not particularly onerous and the Second Circuit has repeatedly upheld indictments that do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." United States v. Motz, 2009 WL 2486132, at *7 (E.D.N.Y.,2009)(internal quotes omitted) *quoting* United States v. Walsh, 194 F.3d 37, 44 (2d Cir.1999). To be legally sufficient, the indictment must specify the elements of the offense in enough detail to give a defendant notice of the charges against him and to permit him to plead double jeopardy in a future prosecution based on the same events. Id. (quoting United States v. Stavroulakis, 952 F.2d 686, 693 (2d Cir.), *cert. denied,* 504 U.S. 926 (1992)).

---

[2] This motion was made by Alberto Antimo Mireles (Docket No. 14). The remaining defendants joined in the motion (Docket No. 17).

In the instant case, the language of Count 2 of the indictment tracks the language of the statute and is sufficient. "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished.' " United States v. Dale, 782 F.Supp. 615, 621 -622 (D.D.C.,1991) quoting Hamling v. United States, 418 U.S. 87, 117 (1974) (internal citations omitted).

Duplicity: The defendants also contend that Count 2 is duplicitous. (Docket No. 14 at page 2). Count 2 alleges that the defendants harbored, and attempted to harbor, multiple aliens. The defendants claims that Count 2 is duplicitous in that it alleges both an attempt and a completed crime. Ordinarily, an attempt is a lesser-included offense of the completed crime and need not be charged at all. *See* Fed.R.Crim.P. 31(c); United States v. D'Amico, 496 F.3d 95, 99 (1st Cir. 2007); United States v. Summit Refrigeration Group, Inc., 2006 WL 3091115, at *5 (E.D.Wis. 2006)("[I]f a defendant can be found guilty of attempt even if attempt is not charged, it cannot be duplicitous to charge [attempt and the completed offense] in one count."); United States v. Stotts, 2002 WL 1477214, at *6-*7 (W.D.Tenn. 2002) (indictment charging attempt to manufacture methamphetamine and completed crime in same count was not duplicitous because attempt was lesser-included offense of completed crime); United States v. Quinn, 364 F.Supp. 432, 437 (N.D.Ga.1973) (stating that by including attempt in the same count of the indictment as the completed offense, "the government is merely making explicit its right to a verdict ... finding [the] defendant guilty of an attempt ... whether an attempt is charged or not").

In United States v. Ramirez-Martinez, 273 F.3d 903, 913-14 (9th Cir.2001), the court held that an attempt to transport undocumented aliens is not a lesser included offense within transporting undocumented aliens under 8 U.S.C. §1324(a)(1)(A)(ii). Thus, in that case, the Court determined that an indictment charging attempt and the completed crime in the same count is duplicitous. The Ninth Circuit reasoned that at common law, "the crime of attempt requires a showing of specific intent even if the crime attempted does not." Ramirez-Martinez, 273 F.3d at 914. Thus, the Court held that a conviction for attempted transport requires proof that the defendant had a *specific* intent to transport undocumented aliens, while a conviction for actual transport requires proof only that the defendant had a *general* intent to transport aliens "with knowledge or reckless disregard of their undocumented status." Ramirez-Martinez, 273 F.3d at 914.[3] The Ninth Circuit stated that in "the § 1324(a)(2) context, to convict a defendant of attempted transportation, the government must prove, among other things, that the defendant had the purpose, *i.e.,* the conscious desire, to transport an undocumented alien within the United States. ... To convict a defendant of actual transportation, the government need show only that the defendant transported the alien within the United States with knowledge or in reckless disregard of the alien's undocumented status." Ramirez-Martinez, 273 F.3d at 914.[4]

---

[3]  The Seventh Circuit, in D'Amico, noted the decision in Ramirez-Martinez on this issue but expressly stated "no position on whether this interpretation of 8 U.S.C. § 1324(a)(1)(A)(ii) is correct." D'Amico, 496 F.3d 95, 99 n.4.

[4]   The Court held that a "practical difference between these two levels of mental culpability is that certain defenses, such as voluntary intoxication and subjective mistake of fact, can negate culpability only for specific intent crimes." Ramirez-Martinez, 273 F.3d at 914 (citations omitted).

The defendants in the instant case are not charged with a violation of the section of the statute at issue in Ramirez-Martinez. In the instant case, Count 2 charges the defendants with violations of 8 U.S.C. §1324(a)(1)(A)(iii) and §1324(a)(1)(B)(i). Section 1324(a)(1)(A)(iii) provides that any person who "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation ... shall be punished as provided in subparagraph (B).[5] It does not appear that the Second Circuit has addressed whether specific intent is required for a violation of harboring or attempted harboring; nor has the Second Circuit determined whether attempted harboring is a lesser included offense within the offense of harboring. Indeed, the parties have not presented any authority expressly discussing an "attempt to harbor" or distinguishing an attempt to conceal, harbor or shield from detection from a completed act of concealing, harboring or shielding from detection. Notwithstanding, the language of § 1324(a)(1)(A)(iii) is very similar to that in section addressed in Ramirez-Martinez. The government does not distinguish the reasoning of Ramirez-Martinez, but instead argues that "criminal charges may aggregate multiple individual actions that otherwise could be charged as discrete offenses as long as all the actions are part of a single scheme." (Docket No. 116 at pabe 11 citing United States v. Margiotta, 646 F.2d. 729, 733 (2d Cir. 1981). In Margiotta, the

---

[5] Section 1324(a)(1)(B)(i) provides that a "person who violates subparagraph (A) shall, for each alien in respect to whom such a violation occurs, ... in the case of a violation of subparagraph (A)(i) or (v)(I) or in the case of a violation of subparagraph (A)(ii), (iii), or (iv) in which the offense was done for the purpose of commercial advantage or private financial gain, be fined under Title 18, imprisoned not more than 10 years, or both."

defendant was charged with mail fraud. One count of the indictment in that case listed 50

mailings. As to whether this constituted impermissible duplicity, the Second Circuit held:

> Thus the issue is whether these 50 mailings may be included in a single count. ... We have recognized that "(i)f the doctrine of duplicity is to be more than an exercise in mere formalism, it must be invoked only when an indictment affects the policy considerations" that underlie that doctrine. United States v. Murray, 618 F.2d 892, 897 (2d Cir. 1980). These include avoiding the uncertainty of whether a general verdict of guilty conceals a finding of guilty as to one crime and a finding of not guilty as to another, avoiding the risk that the jurors may not have been unanimous as to any one of the crimes charged, assuring the defendant adequate notice, providing the basis for appropriate sentencing, and protecting against double jeopardy in a subsequent prosecution. Id. at 896. The identification of these considerations suggests that a single count of an indictment should not be found impermissibly duplicitous whenever it contains several allegations that could have been stated as separate offenses, ... but only when the failure to do so risks unfairness to the defendant. That risk is slight in a case like this where the essence of the alleged wrong is the single scheme to defraud and the various mailings, though they are technically the acts that violate the federal statute, are really the jurisdictional bases for federal prosecution.

Margiotta, 646 F.2d at 732 -733. The reasoning in Margiotta does not address whether it is

permissible to charge two offenses in one count of an indictment which require different

elements of proof, such as differing *mens rea* requirements. It would appear that Count 2 is

duplicitous in this regard. The Court is also not persuaded by the government's reliance on

United States v. Pereyra-Gabino, 563 F.3d 322 (8th Cir. 2009). In that case, the government

charged the defendant with harboring and attempted harboring multiple aliens in the same count.

Although the Court attempted to fashion a clarifying charge with respect to the government's

burden, the Eighth Circuit held that the charge was insufficient and vacated a subsequent

conviction. The Court held:

> These instructions did not require the jury to find that *each* individual Pereyra-Gabino "knowingly shielded from detection or attempted to shield from detection or conceal" was "in the United States in violation of law" and that Pereyra-Gabino "knew or was in reckless disregard" of that fact. Instead, the instructions permitted the jury to mix and match "the individuals identified" to the essential elements of the crime charged. While in some circumstances a general unanimity instruction can cure a deficiency in the body of the instruction, ... neither the unanimity instruction nor the verdict form suffice here. The verdict form also introduces additional uncertainty because it uses the language "harbored or attempted to harbor" to describe the conduct charged while the jury instruction identifies the crime as "shielding from detection or concealment." ... It is true that jury instructions need not be "technically perfect or even a model of clarity." ... Nevertheless, they must inform the jury of the essential elements of the offense charged and the government's burden of proof, ... both of which the instructions failed to do in this instance.

Pereyra-Gabino, 563 F.3d at 328 -329.

Notwithstanding the apparent duplicity of Count 2, dismissal is not warranted on this ground. As stated in Ramirez-Martinez:

> Nevertheless, "[t]he rules about ... duplicity are pleading rules, the violation of which is not fatal to an indictment. Defendant's remedy is to move to require the prosecution to elect ... the charge within the count upon which it will rely. Additionally, a duplicitous ... indictment is remediable by the court's instruction to the jury particularizing the distinct offense charged in each count in the indictment." United States v. Robinson, 651 F.2d 1188, 1194 (6th Cir.1981). In other words, a defendant indicted pursuant to a duplicitous indictment may be properly prosecuted and convicted if either (1) the government elects between the charges in the offending count, or (2) the court provides an instruction requiring all members of the jury to agree as to which of the distinct charges the defendant actually committed.

<u>Ramirez-Martinez</u>, 273 F.3d at 915. See also

The government should be required to elect a charge on which it will proceed or to

fashion remedial jury instructions acceptable to the District Court Judge presiding over the trial

in this matter.


**Deportation of Material Witnesses**

Defendant Jesus Francisco Escalante seeks the dismissal of the indictment on the grounds

that the deportation of material witnesses has deprived him of his Fifth and Sixth Amendment

rights.  (Docket No. 14-2 at page 2; Docket No. 61 at page 3-9).[6]  Escalante asserts that Juan

Temich-Motto and Pablo Giron-Hernandez were interviewed by various law enforcement

agencies and gave information which would be helpful to Escalante.  Escalante alleges that two

other aliens, Edith Correa (aka Edith Flores, aka Edith Cortex-Cruz) and Ricardo Feria-Bautista,

agreed to give incriminating testimony against Escalante and were permitted to remain in the

United States through issuance of a visa. (Docket No. 61 at page 4).  Escalante alleges that the

two unavailable witnesses "are important eye witnesses as to Mr. Escalante since the bulk of the

---

[6]  Defendant Alberto Antimo Mireles raised this issue in this motion. (Docket No. 14).
He alleged that the following witnesses "may testify that their conduct was consensual, that they
were fully responsible for their own conduct and that Mr. Alberto Antimo Mireles did not harbor,
conceal, or shield them from detection": Lorenzo Diogenes Silva-Lopez, Martin Paxtian-Soame,
Edith Cortez-Cruz, Claudia Guzman, Miguel Lopez-Mesa, Antonio Giron-Lopez, Ricardo Feria-
Bautista, Bernabo Encinos-Jimenez, Samual Quino-Pucheta, Pablo Giron-Hernandez and Delfino
Quino-Pucheta. (Docket No. 14-2 at page 3).  Alberto Antimo Mireles has since pled guilty in
this matter.  The remaining defendants summarily "joined" in Alberto Antimo Mireles' motion
(Docket No. 17) but other than defendant Jesus Francisco Escalante (Docket No. 61), the
defendants have failed to identify any specific deported witnesses or proffered what testimony
any specific individual would be able to provide that was material to the charges against them.

government's case against him is expected to revolve around claims that he concealed and harbored and shielded these aliens while at 774 Central Avenue and the Azteca restaurant and by driving them, or calling taxi cabs on their behalf, to get to and from work." (Docket No. 61 at page 4). Escalante asserts that Juan Temich was debriefed "and had nothing incriminating to say about" Escalante (Docket No. 61 at page 4). The defendant does not articulate what testimony Temich could provide that was material to the charges against him. With respect to Giron-Hernandez, Escalante asserts that Giron-Hernandez advised agents from the Department of Homeland Security ("DHS") that Escalante never transported him to work, had nothing to do with him being smuggled into the United States, that he paid his own rent, was free to come and go as he pleased. (Docket No. 61 at page 4). Escalante states that Giron-Hernandez had access to his own car, that Giron-Hernandez had keys to the restaurant (and that Escalante did not have keys). (Docket No. 61, Exhibit B).

The Sixth Amendment guarantees a criminal defendant the right "to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. The mere fact that the Government deported a material witness, standing alone, is insufficient to establish a violation of the right to compulsory process. United States v. Gonzales, 436 F.3d 560, 578 (5th Cir.2006). Instead, to establish such a violation, the defendant must "make [ ] a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." United States v. Valenzuela-Bernal, 458 U.S. 858, 873 (1982). Escalante relies upon Valenzuela-Bernal, in which the defendant was indicted for transporting an undocumented alien in violation of 8 U.S.C. § 1324(a)(2). Two other illegal aliens, who were passengers in the car being driven by the

11

defendant, were also apprehended. These two individuals were deported after an Assistant United States Attorney concluded that they possessed no evidence material to respondent's prosecution.

The Supreme Court held that:

> [T]he responsibility of the Executive Branch faithfully to execute the immigration policy adopted by Congress justifies the prompt deportation of illegal-alien witnesses upon the Executive's good-faith determination that they possess no evidence favorable to the defendant in a criminal prosecution. The mere fact that the Government deports such witnesses is not sufficient to establish a violation of the Compulsory Process Clause of the Sixth Amendment or the Due Process Clause of the Fifth Amendment. A violation of these provisions requires some showing that the evidence lost would be both material and favorable to the defense.

Valenzuela-Bernal, 458 U.S. at 872-873. The Court further explained the defendant's burden in this regard:

> Because prompt deportation deprives the defendant of an opportunity to interview the witnesses to determine precisely what favorable evidence they possess, however, the defendant cannot be expected to render a detailed description of their lost testimony. But this does not, as the Court of Appeals concluded, relieve the defendant of the duty to make some showing of materiality. Sanctions may be imposed on the Government for deporting witnesses only if the criminal defendant makes a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses. In some cases such a showing may be based upon agreed facts, and will be in the nature of a legal argument rather than a submission of additional facts. In other cases the criminal defendant may advance additional facts, either consistent with facts already known to the court or accompanied by a reasonable explanation for their inconsistency with such facts, with a view to persuading the court that the testimony of a deported witness would have been material and favorable to his defense. Because in the latter situation the explanation of materiality is testimonial in nature, and constitutes evidence of the prejudice incurred as a result of the deportation, it

> should be verified by oath or affirmation of either the defendant or
> his attorney.

Valenzuela-Bernal, 458 U.S. at 873 citing to Fed.Rule Evid. 603 and Fed.Rule Crim.Proc. 47.

See also United States v. Ginsberg,  758 F.2d 823, 831 (2d Cir. 1985)(defendant must show

some reasonable basis to believe that the desired testimony would be both helpful and material to

his defense); United States v. Champegnie,  925 F.2d 54, 56 (2d Cir. 1991)(the defendant must

make a "plausible showing that the testimony of the deported witnesses would have been

material and favorable to his defense" and that "there is a reasonable likelihood that the

testimony could have affected the judgment of the trier of fact.").

It would appear that the proffered testimony of Giron-Hernandez is material and

favorable to Escalante's theory of defense in this case.  As noted above, it appears that Giron-

Hernandez would testify that he lived in the same house as several other undocumented aliens

(including at least some of those who may testify against him), that he worked with Escalante at

Azeteca, that Escalante had nothing to do with his coming into the United States, that he paid his

own rent and was free to come and go as he pleased. The government does not appear to dispute

that this is the character and nature of the testimony to be provided by Giron-Hernandez.[7]

---

[7]  The government argues that the proffered testimony of Giron-Hernandez relates only to
the charges in Count 1 of the indictment – that the defendants obtained the labor and services of
the undocumented aliens by threats of serious harm, physical restraint, or by means of a scheme.
The government points out that Escalante is not charged in Count 1. (Docket No. 77 at page 6).
However, the proffered testimony of Giron-Hernandez relates also to Escalante's conduct in the
housing, transportation and employment of the undocumented aliens.  It relates also to the
defendant's argument that he did not harbor, conceal or shield the aliens from detection as
charged in Count 2 of the indictment. The government also argues that just because one
undocumented alien was not "harbored" does not mean that the other undocumented aliens were
not harbored.  (Docket No. 77 at pages 6-7). As discussed above, however, the testimony of
Giron-Hernandez is material to Escalante's defense that those witnesses who testify that

Escalante further contends that those testifying against him, have agreed to do so because they are being allowed to remain in the United States. In this regard, the defendant asserts, the testimony of Giron-Hernandez is material and important to his defense. If the trier of fact were to believe Giron-Hernandez, it could impact the credibility of Edith Correa and Ricardo Feria-Bautista as to the conduct of Escalante. In this way, the testimony of Giron-Hernandez could have an impact on the outcome of this case as to Escalante.

Notwithstanding the above, the defendant has not established any bad faith on the part of the government in deporting Giron-Hernandez. The Second Circuit has interpreted Valenzuela-Bernal as requiring a demonstration of bad faith. Buie v. Sullivan, 923 F.2d 10 (2d. Cir. 1990).[8] The fact that Valenzuela-Bernal requires a finding of bad faith has been applied to cases involving the deportation of witnesses. See United States v. Orozco, 1990 WL 118287 (E.D.N.Y.1990) (The fact that the Government deported Escandon rather than keep her in this country where she would be subject to compulsory process on the defendants' behalf does not deprive the defendants of due process, there being no showing of bad faith on the part of the Government.) citing Arizona v. Youngblood, 488 U.S. 51, 57-58 (1988). See also Petrillo v. United States, 1993 WL 547455 (E.D.N.Y. 1993)(interpreting Valenzuela-Bernal as requiring a finding of bad faith on the part of the government). The Seventh, Ninth, and Tenth Circuits have also held that the defendant must establish that the Government acted in bad faith in deporting a

Escalante committed acts of harboring are only doing so in order to be able to remain in the United States.

    [8] The facts in Buie are different than those in the instant case. In that case, the defendant claimed that the government arrested an individual to prevent that person from provideing favorable testimony to Buie. Buie, 923 F.2d. at 11.

witness to establish a violation of the right to compulsory process. See <u>United States v.</u> <u>Chaparro-Alcantara</u>, 226 F.3d 616, 624 (7th Cir.2000)("Notably, in <u>Youngblood</u>, the Court reaffirmed this holding by pointing to <u>Valenzuela-Bernal</u> as an example of a case in which the defendant was required to show bad faith."); <u>United States v. Pena-Gutierrez</u>, 222 F.3d 1080, 1085 (9th Cir.2000)("To establish that the government acted in bad faith, the defendant must show either "that the Government departed from normal deportation procedures" or "that the Government deported [the witness] to gain an unfair tactical advantage over him at trial."); <u>United States v. Iribe-Perez</u>, 129 F.3d 1167, 1173 (10th Cir.1997)(government must have acted in bad faith in allowing witness with potentially exculpatory information to depart). Although the defendant asserts that the government typically notifies the defense counsel of its intent to deport certain witnesses but did not do so in this instance, this, by itself, is insufficient to establish that the government departed from normal deportation procedures or acted in bad faith.

The defendant has not established that the government departed from normal deportation procedures or that Giron-Hernandez was deported to gain an unfair tactical advantage in this case. Finally, the government represents that should any deported witness wish to testify for the defense at the trial in this matter, the government may make arrangements to parole the witness into the United States for that limited purpose. (Docket No. 77 at page 7, n.1). In light of the above, the motion to dismiss the indictment based upon the deportation of witnesses should be denied.

**The Searches of 101 Lincoln Avenue, the El Caporal,**
**the Don Lorenzo, the La Herradura, and 774 Central Avenue**

Sergio Resendiz argues that insufficient probable cause existed to support the warrant issued for the search of the El Caporal Mexican Restaurant in Cheektowaga, New York ("El Caporal"), the Don Lorenzo Mexican Restaurant in Allegany, New York ("Don Lorenzo"), the La Herradura Mexican Resaurant in Bradford, Pennsylvania ("La Herradura") and 101 Lincoln Avenue, Salamanca, New York. (Docket No. 64). Jesus Escalante asserts that insufficient probable cause existed to support the warrant issued for the search of 774 Central Avenue, Dunkirk, New York. (Docket No. 61). Thus, the respective defendants argue that any evidence obtained as a result of these searches should be suppressed.

An affidavit sworn by Nelson Yera, Jr. dated April 14, 2008 ("Yera Affidavit") was submitted in support of the search warrant requests. The application also sought permission to search several other premises involved in the alleged human smuggling, the harboring and concealment of undocumented aliens and other human rights offenses. The 118-page Yera Affidavit sought arrest warrants for the each of the defendants as well as search and seizure warrants of various restaurants and residences. (Yera Affidavit at ¶¶ 2-3). Yera identifies the individuals involved in the alleged criminal activities, as well as the various restaurants, premises and vehicles involved in the activities (Yera Affidavit at ¶¶ 3-9). Yera describes the various local, state, and federal law enforcement agencies involved in the investigation in New York and West Virginia as well as the nature of that investigation. (Yera Affidavit at ¶ at ¶¶ 10-17). Yera describes the cooperating witnesses ("CW") involved in the investigation. CW#1 is described as a registered informant with the Immigration and Customs Enforcement Agency ("ICE"). The

affidavit states that CW#1 is a native of Mexico, is fluent in Spanish,[9] who has been ordered deported from the United States but is currently released on supervision with employment authorization. (Yera Affidavit at ¶19). CW#1 is alleged to have worked with, and is friends with, Jorge Delarco [Simon Banda Mireles], Sergio Resendiz, Honorio Banda Mirles, Marurilio Feria, Javier Banda Mireles, Miguel Antimo Mireles and Alvaro Soto. (Yera Affidavit at ¶ 20). The Yera Affidavit states that while in the employ of Simon Banda Mireles, CW#1 had been to all of the subject restaurants and had worked at the El Caporal, the Azteca Mexican Food Cantina in Dunkirk, New York ("Azteca"), the Don Lorenzo, the La Herradura and the Jalapeno Loco Mexican Restaurant in Mentor, Ohio ("Jalapeno"). (Yera Affidavit at ¶ 22). Through this experience, the Yera Affidavit asserts, CW#1 observed that the defendants employ and harbor undocumented aliens to work in the restaurants. (Yera Affidavit at ¶ 20, 23). Yera states that the information provided by CW#1 had been cross-corroborated and had led to criminal and administrative arrests and convictions.

Yera describes CW#2 as also being a registered ICE informant, a native of Mexico (fluent in Spanish) who was ordered deported from the United States but is currently released on an order of supervision with employment authorization. (Yera Affidavit at ¶ 25). Yera states that CW#2 has managed various Mexican restaurants for the past 12 years. (Yera Affidavit at ¶ 26). It is alleged that CW#2 has been friends with Delarco [Simon Banda Mireles] since 2005; that Delarco admitted to CW#2 that Delarco employs undocumented aliens in this restaurants; that Delarco admitted that he harbors and transports these aliens between and among his restaurants; that Delarco stated that he pays all the undocumented aliens in cash "off the books" and that the

---

[9]  Yera is also fluent in Spanish. (Yera Affidavit at ¶ 1).

waiters that work in his restaurants earn only tip money and no salary; and that he would have his

managers deal with venders and any situation that would require that they identify themselves to

any regulatory or law enforcement agency . (Yera Affidavit at ¶ 27).   CW#2 advised Yera that he

had spoken to employees at El Caporal, Azeta, and Don Lorenzo who have admitted that they are

undocumented aliens. (Yera Affidavit at ¶ 28). CW#2 stated that Delarco has a sister in Atlanta

with whom he parks money and that he has a BMW that he purchased in his sister's name. (Yera

Affidavit at ¶ 30).[10]


   The El Caporal Restaurant.

   Yera sets forth the allegations of probable cause to search El Caporal in paragraphs 32

through 161 of the affidavit, including.  The Yera Affidavit sets forth the information obtained

from CW#1: that Delarco advised CW#1 that he was the owner of El Caporal and other

restaurants (Yera Affidavit at ¶ 34);[11] that Delarco told CW#1 that Delarco was falsely claiming

to be a Honduran citizen but that he was born in Mexicoya 33);[12]  CW#1's statements that

---

[10]   This information was corroborated in a report of cash payments by Alicia Banda as a
down payment for a BMW from a dealership in Atlanta on December 7, 2005. (Yera Affidavit at
¶ 31).

[11]   This is corroborated by a business certificate filed by Delarco with the Erie County
Court stating that he was doing business under the name El Caporal Mexican Restaurant. (Yera
Affidavit at ¶ 32).

[12]   This information was corroborated by a check of records maintained by the United
States Citizenship and Immigration Service (USCIS).  Yera asserts that Delarco was present in
the United States under a false claim of being a Honduran citizen and that Delarco received
Temporary Protected Status (TPS) and an Employment Authorization Document (EAD) by
submitting a fraudulent Honduran driver's license and birth certificate. ICE later determined that
Delarco's real name was Simon Banda Mireles and that he was born in Mexico. (Yera Affidavit
at ¶ 47).

Delarco admitted that he employed undocumented aliens at the El Caporal (Yera Affidavit at ¶ 34); that CW#1 stated that he observed undocumented aliens working at the El Caporal (Yera Affidavit at ¶ 34). CW#1 also advised Yera that Delarco operates El Caporal with the assistance of his restaurant managers including Resendiz, Honorio Banda Mireles, Javier Banda Mireles and Maurilio Feria (Yera Affidavit at ¶ 35); that Resendiz, Honorio Banda Mireles, Javier Banda Mireles and Feria are involved in making arrangements to employ and harbor undocumented aliens (Yera Affidavit at ¶ 35). The search warrant application states that CW#1 personally observed Honorio Banda Mireles residing with undocumented aliens in Ohio (Yera Affidavit at ¶ 36); that Resendiz is responsible to report and turn over the sales receipts (Yera Affidavit at ¶ 37); that Delarco told CW#1 that he instructed his restaurant managers to under-report cash sales (Yera Affidavit at ¶ 38). On one occasion, Honorio Banda Mireles allegedly instructed CW#1 to clean the interior of his car, and in doing so, CW#1 found receipts, tally sheets, and other records relating to La Herradura. CW#1 stated that he was instructed to throw the material away (Yera Affidavit at ¶ 39-40).[13] According to the Yera Affidavit, CW#1 stated that Delarco advised CW#1, and CW#1 also personally observed, that Delarco and Resendiz deducted bi-weekly from the undocumented aliens pay until each alien's smuggling and/or transportation fees (ranging from $1500 to $2000) were paid off and that the undocumented aliens are told that they cannot leave their employment until the fees are paid off (Yera Affidavit at ¶ 42). Based upon CW#1's conversations with Delarco, one of Delarco's sources for undocumented aliens is Maurilio Feria

---

[13] Yera states that CW#1 advised Yera that he placed the material in three small boxes next to a garbage dumpster. Yera recovered the documents from that location. (Yera Affidavit at ¶ 40). A financial auditor employed by ICE reviewed the documents and determined that Delarco had skimmed $46,738 from La Herradura. The auditor estimated that Delarco was skimming approximately $140,000 a year from each of his restaurants. (Yera Affidavit at ¶ 41).

and that Feria is himself undocumented and employed by Delarco at El Caporal (and sometimes at Azteca, La Herradura and other restaurants in Pennsylvania and West Virginia) (Yera Affidavit at ¶ 43).

Based upon his own observations, CW#1 stated that undocumented aliens employed at El Caporal are housed at 1167 George Urban Boulevard and 212 Arthur Mussara Parkway (both in Cheektowaga) and that the aliens sometimes walk to work at the El Caporal and other times are driven by Feria (Yera Affidavit at ¶ 45-46). CW#1 advised Yera that CW#1 spoke with Lorenzo Diogenes Silva-Lopez, an undocumented alien who worked at El Caporal, who advised CW#1 that he was close to paying off his smuggling and transport fee (Yera Affidavit at ¶ 50). Yera and ICE Agent Kristoffer Cortez corroborated this information by approaching Silva as he was leaving work at the El Caporal on October 30, 2006. Yera states that Silva admitted that he was smuggled into the United States on May 30, 2006 for a fee of $2700and that the arrangements were made by Rolando Feria, an undocumented alien who works as a cook at Don Lorenzo. (Rolando Feria is a relative of Maurilio Feria). Silva advised Yera that his fee would be paid by the owner of El Caporal and that payments against this $2700 fee would be deducted from Silva's pay until it was paid off. Silva further advised Yera that six other employees working at El Caporal were undocumented aliens. Silva also stated that he would be paid $600 in cash every two weeks (for working from 9:00 am to 10:00 pm six days a week), but that he would return $300 to Resendiz, and that every month he and two other undocumented aliens staying with him at 1167 George Urban Boulevard would each pay Honorio Banda Mireles $180 each for rent and utilities. (Yera Affidavit at ¶ 51- 58).

On January 13, 2007, CW#1 advised Yera that Delarco was going to have dinner with

Roman Mireles Martinez, an undocumented alien, at an Applebee's restaurant that evening. (Yera Affidavit at ¶ 60). Once again, this information from CW#1 was corroborated, Yera observed Delarco and Roman Mireles Martinez leave the Applebee's Restaurant as stated by CW#1. On January 14, 2007, after observing Delarco and Roman Mireles Martinez drive to El Caporal; observed Roman Mireles Martinez work as a waiter in the restaurant, Yera asked the Cheektowaga Police to assist in an investigatory stop. Cheektowaga Police Officers did stop the vehicle, and identified the driver as Roman Mireles Martinez and the passenger as Delarco. Yera conducted an immigration check which determined that Roman Mireles Martinez was previously deported and was in the United States illegally. Delarco was released and Roman Mireles Martinez was taken into custody and prosecuted for being present without admission. (Yera Affidavit at ¶ 61-66).

The information from CW#1 was further corroborated by surveillance conducted by ICE agents on El Caporal, 1167 George Urban Boulevard and 212 Arthur Mussara Parkway on February 13, 2007. Agents observed Feria and various workers exit 212 Arthur Mussara Parkway and drive to the El Caporal; other El Caporal workers were observed leaving 1167 George Urban Boulevard and walking to the El Caporal; agents observed a blue Cadillac driven by Delarco park in front of the El Caporal, a passenger (later identified as Fanny Olaya, an undocumented alien from Peru) was observed entering and working at the El Caporal as a waitress. (Yera Affidavit at ¶ 69-71). Feria was observed leaving the El Caporal, proceeding to 1167 George Urban Boulevard and returning to the El Caporal with other workers later identified by CW#1 as undocumented aliens working at the El Caporal. (Yera Affidavit at ¶ 72-76). CW#1 advised Yera that on February 27, 2007, Delarco was going to transport undocumented aliens

that worked in the El Caporal to Ohio so that the undocumented aliens could work in restaurant's Delarco owned there. On February 27, 2007, Yera and other agents followed Delarco and Feria, each driving a car containing various undocumented aliens formerly employed at El Caporal, to Mentor, Ohio, where the entered the Jalapeno Loco Restaurant operated by Delarco. (Yera Affidavit at ¶¶ 81-92).

On May 30, 2007, CW#1 advised Yera that he had learned from Delarco that the El Caporal restaurant located West Virginia had been inspected by the West Virginia Department of Labor, but that all undocumented aliens had left the restaurant before they could be questioned by the inspectors. CW#1 stated that Delarco's manager of the Nogales Mexican Restaurant ("Nogales") in Wheeling, West Virginia was concerned that Nogales would be inspected and that undocumented aliens would be caught. CW#1 stated Delarco sent Resendiz to go to the El Caporal in West Virginia, and Jesus Escalante to go to the Nogales to replace Alberto Altimo Mireles and Alejandro Garcia (both of whom were undocumented) as the respective managers of those restaurants until any inspections were completed. (Yera Affidavit at ¶¶ 93-97; 104). Yera corroborated this information, contacting Inspector Mike Sams of the West Virginia Department of Labor who stated that inspectors had conducted an on-site inspection of the West Virginia El Caporal on May 22, 2007, but could not complete the inspection because all the kitchen workers and the manager left before they could be questioned. (Yera Affidavit at ¶ 98). Sams stated that the inspectors returned on May 25, 2007, and that the workers again attempted to leave, but were stopped by the police. Alberto Antimo Mireles and Jesus Escalante were identified as working at the El Caporal in West Virginia at the time of the May 25, 2007 inspection; Resendiz was identified as the manager. (Yera Affidavit at ¶ 100). Sams stated that all of the kitchen staff at

the El Caporal in West Virginia turned out to be undocumented aliens. (Yera Affidavit at ¶ 101).

On August 7, 2007, Yera received information from CW#1 that Delarco would be transporting two undocumented aliens, who CW#1 identified as Jose Avalos and Fanny Olaya, from the Azteca to the El Caporal. Again, this information from CW#1 turned out to be accurate. On August 7, 2007, Yera and another ICE agent observed Delarco depart the Azteca and followed him until a New York State Trooper stopped Delarco for a moving violation on Interstate 90 near the interchange for New York State Route 400. The State Trooper contacted ICE for assistance in the identification and determination of immigration status of Delarco and the two passengers. Yera searched immigration databases and determined that Delarco's EAD had recently expired with a renewal pending; that Avalos and Olaya were not present in the United States legally. ICE agent Robert Lucas interviewed Delarco who stated that he did not know Avalos[14], that the man had just come into his restaurant in Dunkirk seeking employment for food but that he had no work to offer the man, but agreed to drop him off somewhere in Buffalo. Delarco stated that Olaya was a friend that he was giving a ride home; that he did not know where she lived but that she was married to a United States citizen. (Yera Affidavit at ¶¶ 108-112).

On December 11, 2007, CW#1 advised Yera that Alvaro Soto Paz was instructed by Delarco to pick up undocumented aliens at the El Vaquero Mexican Restaurant in Perrysburg, Ohio and bring them to the Jalapeno Loco restaurant in Mentor, Ohio where Resendiz would

---

[14] Avalos was prosecuted for reinstatement of his prior deportation. Yera stated that he was present in Court when Avalos appeared before Magistrate Judge Kenneth Schroeder. At that time, Avalos was sworn to complete a financial disclosure form. While under oath, Avalos told Magistrate Judge Schroeder that he earned $1200 per month working at the Azteca (contradicting the statements he made when apprehended while driving with Delarco. (Yera Affidavit at ¶ 114).

pick them up and bring them to work at the El Caporal. (Yera Affidavit at ¶ 129). CW#1

identified the undocumented aliens as Alfonso and Miguel (later identified as Alfonso Giron

Lopez and Miguel Giron Guzman). CW#1 stated that he observed Resendiz arrive at the

Jalapeno Loco, pick up the two undocumented aliens, and depart. (Yera Affidavit at ¶ 131).

Cheektowaga Police Officers assisting the ICE investigation, stopped Resendiz's car on Union

Road (approximately 500 feet north of 1167 George urban Boulevard) and determined that the

car contained Resendiz and Alfonso Giron Lopez and Miguel Giron Guzman[15] (consistent with

the information provided by CW#1). (Yera Affidavit at ¶¶ 132-137).[16] Resendiz advised the

officers that he did not know the names of the passengers or their immigration status, and that

both of the individuals had asked him for a ride to Buffalo from Mentor, Ohio so that they could

visit a relative who works in Buffalo. (Yera Affidavit at ¶ 136).

On December 20, 2007, CW#2 advised Yera that Delarco told him that the El Caporal

was losing money and that if some additional advertising did not work, he would consider

closing the El Caporal and would relocate the undocumented aliens to his other restaurants.

Delarco also advised CW#2 that in October 2007 he gave his sister Alicia in Atlanta $25,000 to

hold for him, but that Alicia's son Ulises stole the money and fled. (Yera Affidavit at ¶ 143-

---

[15] In a subsequent interview, both stated that they had a family member employed at the El Caporal, and that the owner of the El Caporal had agreed to employ them and made arrangements to have them transported to the El Caporal from Ohio. They identified Alvaro Soto Paz as the person who drove them from Perrysburg to Mentor. (Yera Affidavit at ¶¶ 138-141).

[16] Delarco was the subject of surveillance at this time. An ICE Agent observed Delarco leave the El Caporal on December 11, 2007, sit in his car at the north end of the parking lot at the El Caporal and watch the vehicle stop of Resendiz's car for a few minutes before departing. (Yera Affidavit at ¶ 133).

144).[17]

The Fourth Amendment prohibits "unreasonable searches and seizures," and requires that "no warrants shall issue, but upon probable cause, supported by Oath." U.S. Const. amend. IV. As noted in <u>United States  v. Falso</u>, 544 F.3d 110, 117 (2d Cir. 2008), the Supreme Court has explained that "probable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts-not readily, or even usefully, reduced to a neat set of legal rules." <u>Faso</u>, 544 F.3d. at 117 quoting <u>Illinois v. Gates</u>, 462 U.S. 213, 232 (1983). "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." <u>Gates</u>, 462 U.S. at 238.  Upon review of a decision to issue a search warrant, a judge's prior determination of probable cause is afforded great deference, and "any doubt about the existence of probable cause [is resolved] in favor of upholding the warrant." <u>United States v. Salameh</u>, 152 F.3d 88, 113 (2d Cir.1998).  Generally, the exclusionary rule bars evidence obtained in violation of the Fourth Amendment. *See* <u>Mapp v. Ohio</u>, 367 U.S. 643, 654-55 (1961). However, even if a search warrant is ultimately determined to lack probable cause, evidence will be admissible so long as the law enforcement officials who

---

[17]  On February 1, 2008, Javier Banda Mireles was assaulted outside of the El Caporal, the assailants took the keys to the restaurant and burglarized the safe, allegedly taking personal papers belonging to Delarco and $10,000 to $14,000 in cash. (Yera Affidavit at ¶ 146).  Four suspects were eventually taken into custody, including Eduardo Rameriz-Lopez, Ulises Verlage, Heather Stanek, and Chalin Lauer.  Ulises Verlage is Alicia Banda's son. Heather Stanek was Delarco's ex-girlfriend.  Eduardo Ramerez-Lopez had previously worked for Javier Banda at the El Tampico restaurant in Willowick, Ohio. Chalin Lauer is a friend, and an ex-girlfriend, of Ulises Verlage.  Stanek provided information to ICE corroborating the information provided by CW#1 relating Delarco's financial operation and that he staffs his restaurants with undocumented aliens. (Yera Affidavit at ¶ 146-161).

executed the search "relied on the warrant in 'objective good faith .'" <u>United States v. Cancelmo</u>, 64 F.3d 804, 807 (2d Cir.1995) (quoting <u>Leon</u>, 468 U.S. at 923). The question of an officer's good faith reliance, or lack thereof, "is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." <u>Leon</u>, 468 U.S. at 923, n. 23.

In the instant case, Resendiz asserts generally that there was insufficient probable cause that "harboring" of undocumented aliens had been committed by the defendants. (Docket No. 64 at pages 2-9; Docket No. 66 at pages 1-4). The defendant's argument rests upon a limited interpretation of what actions would constitute "harboring." The defendant does not cite to any legal authority supporting the limited view offered. As discussed above, the Yera Affidavit provides allegations from cooperating witnesses, CW#1 and CW#2, as well as the observations of Yera and other ICE agents, of the use of undocumented aliens at the El Caporal, as well as the housing of those aliens at various premises, and the transportation of the undocumented workers between restaurants and residences in New York, Ohio and West Virginia. The search warrant application recites the efforts made to shield the presence and identity of the aliens from the law enforcement official (i.e. Delarco's false statements regarding Jose Avalos and Fanny Olaya; the efforts to evade detection of the kitchen workers at the El Caporal in West Virginia; or Resendiz's false statements regarding Alfonso Giron Lopez and Miguel Giron Guzman).

The defendant also argues that there was insufficient probable cause to issue the search warrant for the El Caporal because the supporting affidavit does not stated that any business records would be kept at that premises. (Docket No. 64 at page 11-12). A search warrant may issue to search not only for contraband or the fruits and instrumentalities of criminal activity, but

also for any property that constitutes evidence of a crime, anything in which there is a connection between the item to be seized and criminal behavior.  Warden v. Hayden, 387 U.S. 294, 305-307 (1967).  The information in the Yera Affidavit sufficiently sets forth allegations that undocumented aliens were employed at the El Caporal for the purpose of commercial advantage. In view of the totality of the evidence, it was likely that evidence, in the form of business records, cash register receipts, identification documents, work schedules could be located at the restaurant. Resendiz also argues that the warrant was overbroad because of the broad schedule of items to be seized.  (Docket No. 64 at page 12, Docket No. 66 at page 7).  Initially, the defendant has not demonstrated that the warrant was overbroad either as drafted or as executed. In this regard, the defendant asserts only conclusory hyperbole that the warrant "authorized general rummaging through this family's residence ... as well as the seizure of almost everything that might have sparked the interest of the investigators, whether it was evidence of a crime or not." (Docket No. 66 at page 9).  Here, the crime charged implicates a variety of items as possible evidence relating to both conduct indicative of harboring and commercial advantage. Thus, the search warrant properly listed various forms of identification, business records, documents relating to travel, various forms of financial records, and currency.  The Yera Affidavit also sets forth information to the effect that at least one of the defendant's kept a gun at both his restaurant and his residence. (Yera Affidavit at ¶¶ 154-155). The charges in the indictment allege a fairly complex scheme in which the defendants allegedly arranged for the transportation of undocumented aliens, obtained a commercial advantage by employing them in various restaurants in three states. The scope of the warrant is dependant upon the nature of the evidence and the complexity of the underlying crime.  In United States v. Riley, 906 F.2d 841, 844 -845

(2d Cir. 1990) stated:

> In upholding broadly worded categories of items available for seizure, we have noted that the language of a warrant is to be construed in light of an illustrative list of seizable items. ...  In the pending case, the warrant supplied sufficient examples of the type of records that could be seized-bank records, business records, and safety deposit box records. No doubt the description, even with illustrations, did not eliminate all discretion of the officers executing the warrant, as might have occurred, for example, if the warrant authorized seizure of the records of defendant's account at a named bank. But the particularity requirement is not so exacting. Once a category of seizable papers has been adequately described, with the description delineated in part by an illustrative list of seizable items, the Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgment as to whether a particular document falls within the described category. ... It is true that a warrant authorizing seizure of records of criminal activity permits officers to examine many papers in a suspect's possession to determine if they are within the described category. But allowing some latitude in this regard simply recognizes the reality that few people keep documents of their criminal transactions in a folder marked "drug records."

Riley, 906 F.2d. At 844-845.  "As a result, a lengthy list of categories is to be expected: the degree to which a warrant must state its terms with particularity varies inversely with complexity of the criminal activity investigated." United States  v. Cohan, 628 F.Supp.2d 355, 362 (E.D.N.Y.,2009) quoting United States v. Regan, 706 F.Supp. 1102, 1113 (S.D.N.Y.1989). In any event, the defendant has not articulated any prejudice to the defendant from the inclusion of any particular item among the schedule of items to be seized.

Finally, the defendant contends that the government failed to properly inventory the items seized. (Docket No. at page 15; Docket No. 66 at page 12).   In this regard, the defendant contends that the inventory is inadequate in that an item was described as a "briefcase containing

documents" but does not list them as "business records" or include a detailed description of the

documents in the briefcase. (Docket No. 64 at page 15). Rule 41 of the Federal Rules of

Criminal Procedure requires, among other things, that an officer executing a warrant prepare an

inventory and receipt of the property seized to be left at the place searched, with the property

owner, and with the judge who issued the warrant. See Fed.R.Crim.P. 41(f). Because violations

of this rule only take place after the search has already occurred, they generally do not assume

"constitutional magnitude." United States v. Burke, 517 F.2d 377, 386 (2d Cir.1975).

Accordingly, for evidence to be suppressed due to a Rule 41 violation, the Second Circuit

requires a defendant show that "(1) there was 'prejudice' in the sense that the search might not

have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is

evidence of intentional and deliberate disregard of a provision in the Rule." Burke, 517 F.2d. at

386-87; see also United States v. Pangburn, 983 F.2d 449, 455 (2d Cir.1993); United States v.

Rollack, 90 F.Supp.2d 263, 271 (S.D.N.Y.1999). The defendant has presented no authority

stating that the government was required to provide a detailed listing of each document seized.

Moreover, the defendant has not demonstrated any prejudice due to the lack of a detailed listing

of each document seized. See United States v. Nichols, 344 F.3d 793, 799 (8th Cir.2003)

(suppression not required for violation of Rule 41(f) where defendant failed to establish

prejudice); United States v. Adams, 401 F.3d 886, 893 (8th Cir. 2005)(same); United States v.

DiMott, 2006 WL 3782703, at *17(D.Me.,2006)(a motion to suppress for a failure to

particularize should be granted only when the defendant demonstrates legal prejudice or that non-

compliance with the rule was intentional or in bad faith); United States v. Dauphinee, 538 F.2d 1,

3 (1st Cir.1976) ("Although we think that it would have been better practice if the return had

29

stated that the revolver was found and seized, we do not think that the government agent's failure to make an accurate return requires suppression of the evidence in this case. The various procedural steps required by Rule 41(d) are basically ministerial. Appellant has not demonstrated that he was prejudiced by the failure of the return to mention the revolver, and there is no indication that the government was not acting in good faith. Under these circumstances the district court did not err in denying the motion to suppress insofar as it was based on the wording of the return.").

In light of the above, defendant Resendiz's motion to suppress evidence obtained as a result of the search of the El Caporal restaurant should be denied.

The Don Lorenzo Restaurant.

Defendant Resendiz also seeks to suppress evidence recovered as a result of the search of the Don Lorenzo restaurant. (Docket No. 64 at page 1). The Yera Affidavit includes sufficient probable cause to believe that Delarco was the owner of the Don Lorenzo (Yera Affidavit at ¶pp 184-186); that Resendiz was a manager of the restaurant (Yera Affidavit at ¶ 187); that 12 undocumented aliens from Mexico were employed by the defendants at that restaurant and lived in apartments directly above the restaurant (Yera Affidavit at ¶ 187-188). Yera stated that on March 3, 2007, Yera interviewed Alberto Antimo Mireles who stated that Resendiz supervised him as manager of the Don Lorenzo; that Resendiz hired him to work at the Don Lorenzo and that Resendiz knew that he was an illegal alien at the time he was hired. (Yera Affidavit at ¶¶ 195-196). On September 26, 2007, Yera received an update as to the Don Lorenzo from CW#1

who stated that based upon conversations with Honorio Banda Mireles and Resendiz, the Don Lorenzo was still managed by Resendiz, that Maurilio Feria had recently been promoted to assistant manager, and that 9 undocumented aliens were employed at the Don Lorenzo and lived in the apartments above the restaurant. (Yera Affidavit at ¶ 201).

The defendant does not articulate any specific challenge to the search warrant executed at the Don Lorenzo restaurant. Instead, the defendant asserts the challenges discussed above relating to the search of the El Caporal restaurant. (Docket No. 64 at ¶30). The information contained in the Yera Affidavit is sufficient to establish probable cause to believe that criminal activity (i.e. the employment and harboring of undocumented aliens) was taking place at the Don Lorenzo restaurant. The defendant's other legal challenges to the search of the Don Lorenzo fail for the same reasons set forth above relating to the challenge of the search at the El Caporal.

The defendant's motion to suppress evidence obtained as a result of the search of the Don Lorenzo restaurant should be denied.


The La Herradura Restaurant.

The search of the La Herradura restaurant in Bradford, Pennsylvania was pursuant to a warrant issued by Magistrate Judge Susan Paradise Baxter of the Western District of Pennsylvannia on April 10, 2008. The warrant was issued based upon an affidavit by Nelson Yera on April 10, 2008 ("Yera Pennsylvania Affidavit"). The Yera Pennsylvania Affidavit describes the various premises sought to be searched, and identifies the various individuals alleged to be involved in the activities to employ undocumented aliens at the various restaurants

operated by Delarco. (Yera Pennsylvania Affidavit at ¶¶ 1-11). Yera identifies CW#1 and CW#2 and describes the nature of the information and the reliability of the information provided by these cooperating witnesses. (Yera Pennsylvania Affidavit at ¶¶ 16 - 27). The Yera Pennsylvania Affidavit establishes that Delarco is the owner of the La Herradura (Yera Pennsylvania Affidavit at ¶ 30) and outlines the activities of Delarco and the other defendants generally (Yera Pennsylvania Affidavit at ¶¶ 32-37). The Yera Pennsylvania Affidavit contains information regarding CW#1's discovery of documentation in the trunk of Honorio Banda's vehicle which was determined to be receipts, invoices and tally sheets from the La Herradura evidencing that Delarco "skimmed" $46,738 from the La Herradura operations. (Yera Pennsylvania Affidavit at ¶¶ 38-40). The Yera Pennsylvania Affidavit also stated the information provided by CW#1, based upon conversations between CW#1 and the various defendants, as well as upon CW#1's own observations, detailing the defendants various movement of undocumented aliens between the El Caporal, the Don Lorenzo, the Nogales, the El Caporal in West Virginia and the La Herradura. (Yera Pennsylvania Affidavit at ¶¶ 41-47, 48-55). The Yera Pennsylvania Affidavit reflects information from CW#1 to the effect that most of the workers at La Herradura are undocumented aliens. (Yera Pennsylvania Affidavit at ¶ 47). On November 15, 2007, CW#11 informed Yera that Alvaro Soto Paz told CW#1 that Javier Banda Mireles was transportig David Serna from Bradford, Pennsylvania to the El Caporal (where he would work for a few days before being moved on to the Jalapeno Loco in Mentor, Ohio). (Yera Pennsylvania Affidavit at ¶ 61). This information from CW#1 was corroborated as reflected in the information obtained from Border Patrol Agent Gary Roussie who stated that on November 15, 2007 he assisted in a vehicle stop on Route 219. The driver of the car was identified as Javier Banda Mireles; and the

passenger was identified as David Serna. (Yera Pennsylvania Affidavit at ¶ 62-63). It was determined that Serna had no lawful status in the United States. Roussie stated that, upon questioning, Serna stated that he had worked at the La Herradura in the past. Banda told Roussie that he was returning from Ohio, that he stopped at the La Herradura for dinner, struck up a conversation with Serna and agreed to drive him to Buffalo. (Yera Pennsylvania Affidavit at ¶ 65). On January 13, 2008, CW#1 informed Yera that five undocumented aliens were working at La Herradura and that they lived in an apartment approximately 500 feet from the restaurant. (Yera Pennsylvania Affidavit at ¶ 71). Surveillance of the La Herradura revealed that the kitchen staff entered and departed through the rear of the restaurant, while the other employees used the front entrance (Yera Pennsylvania Affidavit at ¶ 78).

Once again, the defendant does not articulate separate and distinct challenges to the search warrant issued for the La Herradura restaurant, but asserts the same arguments presented as to the warrant for the El Caporal restaurant. As discussed above, the Yera Pennsylvania Affidavit contains is sufficient to establish probable cause to believe that criminal activity (i.e. the employment and harboring of undocumented aliens) was taking place at the La Herradura restaurant. The defendant's other legal challenges to the search of the Don Lorenzo fail for the same reasons set forth above relating to the challenge of the search at the El Caporal.

The defendant's motion to suppress evidence obtained as a result of the search of the La Herradura restaurant should be denied.

<u>101 Lincoln Avenue.</u>

Defendant Resendiz also challenges the search of 101 Lincoln Avenue in Salamanca, New York. Resendiz asserts that the search warrant application provides no justification that any records relating to the harboring of undocumented aliens would be found at that location. (Docket No. 64 at ¶ 31). Based upon information obtained from CW#1, corroborated by information obtained from the Accurint Automated Database for Law Enforcement, 101 Lincoln Avenue is the residence of Resendiz. (Yera Affidavit at ¶¶ 245-246). The Yera Pennsylvania Affidavit reflects that CW#1 stated, based upon his own observations, that Resendiz uses a laptop computer to maintain business records and to access surveillance system that monitors the activities of undocumented aliens working at the various restaurants operated by the defendants. (Yera Affidavit at ¶ 248). According to CW#1, Resendiz is also responsible to report and turn over sales receipts from at least three of the restaurants to Delarco. (Yera Affidavit at ¶ 247). Surveillance by ICE agents on March 13, 2008, March 14, 2008, and March 19, 2008 reflected that Resendiz was seen entering and exiting 101 Lincoln Avenue carrying a dark bag similar to a laptop computer bag. (Yera Affidavit at ¶pp 249-253). It does not appear that Resendiz utilized any particular location as a primary office in carrying out the activities described in the Yera Affidavit. In light of the prominent role alleged to be played by Resendiz in the activities surrounding the employment of undocumented aliens, it was reasonable to believe that information relating to the arrangements regarding the transportation, housing, employment of the undocumented aliens, as well as evidence relating to the commercial advantage with respect to the use of these undocumented aliens, would be located at Resendiz's residence. Based upon the totality of the information presented, there was a fair probability that evidence of a crime

would be found in a search of 101 Lincoln Avenue. See <u>Gates</u>, 462 U.S. at 238. In any event, the defendant has not articulated a basis upon which to preclude application of the good faith exception in <u>Leon</u>.

The defendant's motion to suppress evidence obtained as a result of the search of 101 Lincoln Avenue, Salamanca, New York should be denied.


<u>774 Central Avenue.</u>

Defendant Escalante challenges the search warrant executed at 774 Central Avenue, Dunkirk, New York. (Docket No. 61 at page 10). Similar to the argument asserted by Resendiz, Escalante maintains that there was insufficient probable cause to issue a warrant authorizing the search of 774 Central Avenue. (Docket No. 61 at page 17). Escalante does not dispute that he resided at that residence (Docket No. 61 at page 12). The Yera Affidavit sets forth information obtained from CW#1 to the effect that undocumented aliens employed in the Azteca resided in an apartment upstairs from Escalante. (Yera Affidavit at ¶ 257); that Escalante would transport some of the undocumented aliens to work at the Azteca, and back to 774 Central Avenue after work (Yera Affidavit at ¶¶ 258, 260). CW#1 also advised Yera that, based upon CW#1's own observations, Esclante maintained business records relating to four of the restaurants on a laptop computer and that Escalante uses the laptop computer to access a surveillance system that monitors the activities of undocumented aliens working at the various restaurants operated by the defendants. (Yera Affidavit at ¶ 261). Surveillance by ICE agents on each day from March 21, 2008 to March 24, 2008, reflected that Escalante was seen entering and exiting 774 Central

Avenue carrying a dark bag similar to a laptop computer bag. (Yera Affidavit at ¶pp 263-267). CW#1 had also informed Yera that Escalante was promoted to manager and was responsible for the day to day operations of the Azteca, including payroll, collection of rents and utility money from the undocumented aliens and monitoring undocumented aliens working at the Azteca. (Yera Affidavit at ¶ 269). In light of the prominent role alleged to be played by Escalante in the activities surrounding the employment of undocumented aliens, including the alleged daily transportation of undocumented aliens who he supervised and who lived in the same building as his residence, it was reasonable to believe that information relating to the arrangements regarding the transportation, housing, employment of the undocumented aliens, as well as evidence relating to the commercial advantage with respect to the use of these undocumented aliens, would be located at Escalante's residence. Based upon the totality of the information presented, there was a fair probability that evidence of a crime would be found in a search of 774 Central Avenue,  See Gates, 462 U.S. at 238. In any event, the defendant has not articulated a basis upon which to preclude application of the good faith exception in Leon.

The defendant's motion to suppress evidence obtained as a result of the search of 774 Central Avenue, Dunkirk, New York should be denied.


**December 11, 2007 Vehicle Stop**

Defendant Resendiz also seeks to suppress any evidence and statements obtained as a result of a vehicle stop on December 11, 2007. (Docket No. 64 at page 19). The Yera Affidavit reflects that on December 11, 2007, CW#1 advised Yera that Alvaro Soto Paz had been

36

instructed by Delarco to pick up undocumented aliens at the El Vaquero Mexican Restaurant in Perrysburg, Ohio and bring them to the Jalapeno Loco restaurant in Mentor, Ohio where Resendiz would pick them up and bring them to work at the El Caporal. (Yera Affidavit at ¶ 129-141). As noted above, CW#1 identified the undocumented aliens as Alfonso and Miguel (later identified as Alfonso Giron Lopez and Miguel Giron Guzman). CW#1 stated that he personally observed Resendiz arrive at the Jalapeno Loco, pick up the two undocumented aliens, and depart. (Yera Affidavit at ¶ 131). Later on December 11, 2007, Cheektowaga Police Officers assisting the ICE investigation, stopped Resendiz's car on Union Road (approximately 500 feet north of 1167 George urban Boulevard) and determined that the car contained Resendiz and Alfonso Giron Lopez and Miguel Giron Guzman (consistent with the information provided by CW#1). (Yera Affidavit at ¶¶ 132-137). Resendiz advised the officers that he did not know the names of the passengers or their immigration status, and that both of the individuals had asked him for a ride to Buffalo from Mentor, Ohio so that they could visit a relative who works in Buffalo. (Yera Affidavit at ¶ 136).

The defendant maintains that there was no basis for the stop and resulting search. However, at the time of the stop ICE agents had reasonable suspicion, if not probable cause, to believe that Resendiz was transporting undocumented aliens in the vehicle. As the Yera Affidavit demonstrates, the information came from a highly reliable cooperating witness who had provided the investigating agents with information that had been corroborated on several occasions. It is well settled that if police have a reasonable and articulable suspicion, they may briefly stop someone. *See* Illinois v. Wardlow, 528 U.S. 119, 123  (2000); citing Terry v. Ohio, 392 U.S. 1, 30 (1968); see also United States  v. Lucky,  569 F.3d 101, 106 (2d Cir. 2009).  This authority

includes the right to halt a moving vehicle, *see* <u>United States v. Hensley</u>, 469 U.S. 221, 226 (1985), and to investigate prior criminal conduct. <u>Lucky</u>, 569 F.3d at 106. Based upon the information obtained from CW#1, it was permissible to effectuate an investigative stop of Rensendiz's vehicle on December 11, 2007. The investigatory stop confirmed that Resendiz was transporting undocumented aliens. The defendant has not demonstrated a basis to suppress the evidence and statements obtained as a result of the vehicle stop. Thus, the defendant's motion to suppress the evidence obtained as a result of the December 11, 2007 stop should be denied.

### Conclusion

Based on the above, it is recommended that the respective motions to dismiss the indictment and to suppress evidence be denied. Pursuant to 28 U.S.C. §636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within ten(10) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as W.D.N.Y. Local Rule 72(a)(3).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED**

**HEREIN.** <u>Thomas v. Arn</u>, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed2d 435 (1985); <u>F.D.I.C. v. Hillcrest Associates</u>, 66 F.3d 566 (2d. Cir. 1995); <u>Wesolak v. Canadair Ltd.</u>, 838 F.2d 55 (2d Cir. 1988); see also 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and W.D.N.Y. Local Rule 72(a)(3).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. See <u>Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co.</u>, 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y. Local Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3) may result in the District Court's refusal to consider the objection.**

So Ordered.

/s/ Hugh B. Scott

United States Magistrate Judge
Western District of New York

Buffalo, New York
November 23, 2009